2-15-0047, City of Elgin, Petitioner of Elgin, v. Illinois Commerce Commission, Commonwealth, v. Ed Hall, Respondent, Appalachia. Arguing on behalf of Petitioner of Elgin, Attorney, Mr. Christopher K. Batten. Arguing on behalf of Respondent, Appalachia, Attorney, Mr. Richard E. Burnett. Also arguing on behalf of Respondent, Appalachia, Attorney, Mr. Matthew L. Harvey. Okay, Mr. Beck. Good morning, sir. Good morning. May it please the Court? My name is Christopher Beck, and I'm representing the City of Elgin in this appeal. To put it simply, the administrative law judges that oversaw this proceeding before the Illinois Commerce Commission got it right in their proposed order. Commonwealth, all of a sudden, commonly failed to meet its statutory burden, making a showing of good cause for failing to provide an alternate route for the eastern 12 miles of the Grand Prairie Gateway Project. It's 20% of the route that goes through the city, a portion of which goes through the City of Elgin. Based upon its failure to identify the alternate route, Commonwealth also failed to meet its burden of showing that the project was the least cost means of achieving the project's objective. Finally, although not addressed in the proposed order, there's an alternative basis for reversal in that the Commission staff in this case failed to adequately investigate these issues. With due respect to the Commission, its analysis of these issues was flawed and inconsistent with the evidence and the record of the structure and purpose of the Public Utilities Act, and its order should be reversed. Mr. Beck, I read your brief, and I read it completely through, and I felt like there was something missing, so I read it again. Actually, I didn't read it again. I went through it again. I couldn't find a dollar sign or a dollar amount anywhere in your brief. I believe I found in your appendix the Commission judgment order, which contained dollar figures. There were dollar figures in the Apple East brief indicating why putting the cables underground for the 12 miles would be close to something like $360 million. Your reply brief, again, did not have a dollar sign or a dollar amount anywhere in your brief. When you appeal, or when anybody appeals a case to this Court or to the Supreme Court, there's something called a burden on review, and the burden on review is to establish that what happened below was wrong and that you were prejudiced. And I can accept your arguments relative to procedural error, not needing a dollar amount, but when you start talking in terms of what was least expense, whether it was right or wrong, I don't know how you can talk about least expense without talking about dollars. Can you explain to me why your brief doesn't contain any amounts of money such that we are supposed to be able to obtain or procure a perspective, a frame of reference, such that whatever the Commission decided was manifestly erroneous? Your Honor, I would address that. As Elgin has argued in his brief, there are no dollar amounts. The City does not undergo any kind of proofs with respect to the negative externalities and costs that the citizens of the City of Elgin will be impacted by if this route is allowed to be constructed with the overhead lines. So regardless of how much it costs, it doesn't matter because that shouldn't come into play? No, I think that would come into play if comments had fulfilled its... So then how do we know if the least cost means was taken into consideration if you don't mention any dollar amounts? I think that's exactly the City's point. The entire process was short-circuited by comments of failure to submit alternate routes and alternative forward view. They are relying on the statutory exception, the good cause exception, for failing to identify alternate routes through this area. Had they submitted an alternate route as required by the statute, there would have been some basis for comparison. Elgin could have submitted, argued that an alternate route that did not go through Elgin was superior to the preferred primary route of comment if their primary route went through Elgin. But that entire process was short-circuited because there are no alternative routes. So really, the entire least cost analysis that the Commission undertook was flawed. And I think that Bruce pointed that out because there's nothing to compare it to. Comment did submit evidence. Did it not as far as the amount that it would cost to put it underground? It did submit evidence with respect to the cost of underground. But again, Elgin has argued it's our position. That was not offered as a proposed alternative. This is nothing that appeared in their initial petition. It's nothing that they were asking the Commission to consider. When Elgin raised the issue, they did submit some cursory evidence about the cost for undergrounding. The City's initial brief discusses that evidence. They rely primarily on the testimony of one of the witnesses, Neal Kopp. But that testimony indicates that it was just a preliminary analysis, that it was not based on any specific design. It couldn't give a confidence level as to those estimates. It's less precise. Didn't staff indicate that even with that estimate, the least it would be is a 30% reduction, which would make it, in essence, even with that 30% reduction, double the cost of the project? Well, staff did say that. So again, we're on review here. We're not the ICC. We have to look at whether the ICC had a basis to reach a decision that they've reached. And there is evidence in the record. Is there not of this cost? They did submit evidence to the record with a route that was not proposed. It's Elgin's submission that had they proposed undergrounding at the beginning of the route, at the beginning of the process, then that's something that Elgin would have had an obligation to consider to engage in the process to try to put dollar signs on the costs and impacts that they will have, that an above-ground route would have as compared to the underground route. And we submit that it was error for the commission to make findings based on this preliminary analysis for a hypothetical underground route based on some preliminary analysis. I think had that been a proposed route, then I think points would definitely be well taken that there would have to be evidence in the record for Elgin to prevail on its position that the county had failed to meet its burden. The overlying point when it comes to least-cost means is that the process was short-circuited because they're arguing that they don't have to propose an underground route. They never proposed an underground route. At the end stages of the hearing, they submitted some evidence. And in their rebuttal testimony, not in their filing, their rebuttal testimony, they submitted a preliminary analysis of what it would cost to underground the route. I don't think the city was obligated to undertake a full, you know, fully address that for a route that was not even proposed. Isn't least-cost means factored into good cause? I mean, I know there are two different parts of the statute, and I don't mean to conflate those issues, but doesn't least-cost means play a part in good cause? I mean, if you're showing good cause for not proposing an underground route because of the cost, doesn't that take into consideration some of the factors in least-cost means? You know, I think that when it comes to looking at good cause, I think that is a factor, but I think that that is something for the commission to consider. The statute requires the county to identify alternate routes, kind of substituting their judgment that we're not going to offer this alternative of undergrounding because we've done our internal studies, our internal analysis, our internal determination, and we've determined that we're not going to propose that. It's ultimately they have to at least propose it as an alternative. It's not good cause for not submitting it as an alternative. Well, say they submit it as an alternative. Then what? Then it's on the table before the commission. The interveners have a chance to submit data requests on that to find the basis for their conclusions, whatever they submit in their initial filing. It would be something that would be considered by the parties at the outset of the proceeding, and then it would be the commission to decide whether or not that was, in fact, the least-cost means. But the fact that ComEd determined that it was prohibitively expensive, it's really not for them to decide. They have the burden, the obligation, the statutory obligation to submit alternate routes for the project, and that's something that they failed to do in this case. What is the advantage or what are the beneficial attributes of burying the cables? The beneficial attributes, I mean the primary beneficial attribute, is that the overhead cables are going to impact future development in the area. They impact the existing residents in the area with respect to their aesthetic values, you know, the... Well, you said they impact them, but you didn't say how they impact them. Is it through... Essentially what I'm getting at is it seems like your argument is that this isn't a health hazard. Eagles, birds, and drones are not being harmed or injured by these towers. The problem is that they're aesthetically ugly. Is that an accurate statement or not? That's not the sole problem. That's one of the factors of the 12-factor test. Okay, well, let's get to the factors other than it's ugly because I'm not aware of too many of them. I believe there was some indication that when something is buried, it becomes more difficult to service. Is that not correct? I don't think, I mean, I don't believe that's correct. I don't think that's an issue that has been fully submitted before the commission. I don't know, based on record, how frequently overhead lines have to be maintained versus how long underground lines, the lifetime of those lines. The point is that when you maintain something above ground in the air, you don't have to dig dirt. That's the point. That's the idea about servicing. When a line is down or when it's sparking, when there's an incident that's doing this, usually you can tell by looking at it. You can't necessarily, unless you're a superman, look through the ground to see where the problem is. That may be true, but it also may be the case that overhead lines are much more frequently damaged and much more subject to having to be repaired. That's a good point. Was there any evidence presented by you? No. Because you were the one that proposed the underground alternate route. Well, we were saying that ComEd should have proposed the underground alternative. You said they should have considered it. You didn't necessarily propose it. If they were going to argue that there's no viable overhead alternatives, then they should have at least, at a minimum, this was a fallback position, been required to at least submit the underground route for it. In other words, if there wasn't an alternative overhead on a different parcel of land, then they should have at least offered to put it underground. That's correct. That's correct. In this densely populated area, which is one of the bases they rely on, they should have let you correct your doubt. You've said repeatedly in your brief that this was a case of first impression, correct? With respect to the interpretation of the good cause requirement in the statute. Well, the process of granting the relief and so on. So is good cause defined in other sections of other statutes that might have some relevance here? Well, this did come up in earlier briefing. The commission never did define good cause, and the statute doesn't define good cause in this context. Good cause is a term of art that really varies on the context, but basically good cause is a term that has a specific definition, and I think what you're suggesting is this term is so abstract, nobody seems to know what it means right now. Now, maybe after five or ten years or 20 cases, there will be a distinct definition, a definite terminology, so to speak, but if this is a case of first impression, I'm having a problem conceptualizing how a term of art, which is supposed to be a word, usually a noun, has a definite, specific, and usually narrow meaning within a particular field, such as the law or science. Well, I think it means it has to be a legally sufficient cause, and I think I do agree with your point that that does have to be, that is something that will evolve over time as more cases are considered, but the city's submission is that however that was defined, it was not met in this case. There was not good cause for submitting to the commission the alternative routes that come at internally considered, and it's the commission's role to make those determinations. Doesn't the rebuttal testimony of Murphy talk about all that which you're talking about, that they took into consideration other routes, but this was the shortest route, this would affect the least amount of residents, et cetera? How is that not the testimony you're looking for? Well, I guess to the first point, the rebuttal testimony was not in the initial filing. The city has argued that comment was required to make these arguments in their initial filing, but to your point directly, there was no specific information with respect to Ms. Murphy's testimony, only conclusions you will find in there, what alternate routes were considered, what was their specific length, how many homes were impacted or not impacted by this route, and really, if you read the testimony I have, and I'm sure you've had it and it's been cited in the briefs, it really comes down, I think, to comment arguing that it had existing right-of-way in this area of the project, and that they determined based on that that this was the superior route and they weren't going to submit these alternate routes to the commission. Did the ALJs that you rely on their ruling, did they indicate that other overhead routes should have been proposed? They argued that comment, or in their order they said the comment did not show good cause, failing to identify alternate routes. But they specifically mentioned the underpass. And then they did specifically mention the underpass. Did they specifically mention, and I don't recall them mentioning, that other overhead routes should have been proposed? I think that's within the scope of their ruling. But they specifically mentioned undergrounding because that was a very specific thing. There were no comments, testimonies. That's what you were looking for, right? The city was looking for underground. The city would be satisfied with some. I don't know what other routes are out there. I didn't do the 20,000 hours of study, but if there was a route that started south, proceeded west, and went north, maybe it's more costly in some respects but impacts less homes. I mean, that's the kind of thing. The city would be satisfied with that. It's the direct impact on the residents in the city of Belgium that we're concerned about. Anything further? Thank you, sir. Mr. Burnett. And you have eight minutes. May it please the Court, Your Honor. Richard Burnett on behalf of Commonwealth Medicine Company. I'm going to take about eight minutes of time, and then my co-counsel, Matt Harvey, is going to take the remaining time. I'm going to focus on the good cause standard, but before I get to that, I'd like to tell you what's not in dispute here. What's not in dispute is that this line is necessary to save customers hundreds of millions of dollars that they're paying in excess of what they should be paying because of chronic congestion on the grid. That congestion started four years ago and continues to worsen. That's not in dispute. This case also comes to the Court in an unusual posture, and by that I mean the commission issued its order 16 months ago. The end service date is June of next year. Elgin saw no stay in this case. Can I get back to your first point? Did the ALJs find opposite to what you just argued? I think they, Mr. Harvey will address that, but I think they summarily concluded that we didn't establish good cause. I'm talking about pursuant to 8406.1F1 of the Act, the commission finds the comment has not provided evidence that the project is necessary to provide adequate and efficient service or that it would increase reliability. Well, it certainly wasn't necessary to improve reliability. There's no question about that, Your Honor. I think they just missed the boat. I think the evidence in the case is overwhelming and uncontroverted. The commission staff agreed with comments, witnesses, that this line will save customers $250 million over the first 15 years, net of all costs. The reason the line is being built is not because of the reliability prong of the statute. It's because of the competitive, it promotes the competitive nature of the market in northern Illinois. Did that answer your question? Yes. Thank you. So, the comment started construction. And, in fact, in the 12 miles that are in dispute, comment has already constructed, fully constructed four miles. The other 12 miles will be done by the end of the year. The question before this court is whether the ICC's conclusion that comment didn't establish an alternative route in that 12 miles is supported by substantial evidence. And I've got to tell you, I think the evidence is overwhelming. I'd like to direct the court's attention to the direct testimony of Ms. Donnell Murphy, an outside siting expert who testified in this case on behalf of comment. And what I'd like to direct you to more specifically is the routing study that's appended to our brief. And the reason I'd like you to look at that is because it's in color. And there's some graphs I want to point to that aren't apparent in the record. ERM used nine major steps to reach its ultimate conclusion. It started with data collection, and that's referred to on pages four through seven. They literally scoured every publicly available piece of information and private databases to get all the land use data in the entire 700 square miles of the study area. There could not have been more information that they started with. That information is summarized in a 50-page baseline resource report that begins at page A114. The next step is they compiled all that information into an electronic database called a GIS database. And what's interesting about that is it allowed multiple layers of information to be analyzed. The next thing they did is categorize that data into two major categories, opportunities and sensitivities. The opportunities are those land features that would be compatible with the transmission line, like railroads, major highways. Sensitivities are things that might necessarily not be that compatible with the transmission line, like residential subdivisions. They looked at all of that. They then overlaid the opportunities with the sensitivities, and that's on page nine of the study. If you look at figure five on page nine, you can see there's a composite of all of the opportunities and sensitivities. The opportunities are those green segments. Those are route opportunities. Those are route alternatives. That's what they started with. There's literally hundreds of them, including hundreds in the eastern 12 miles. So when someone says we didn't consider that, that's not true. The sensitivities are apparent in the orange underlying the green lines. And this is when ERM made its first cut of the information and identified and got rid of the first round of routes. If you look at what's stated on page nine, linear opportunities that conflicted with the intended directional orientation of the project, generally west to east, were removed from consideration without further study. Opportunities located in highly constrained areas were also removed from consideration. Where removal conflicted with the general direction, those were removed. So they had to have a way to do this systematically. That resulted in what's at figure six, the remaining opportunities. And you can see, if you look to the right of that graph, there are still many route segments in the east. They didn't ignore that information. The next thing they did is they introduced a quantitative analysis. And by that I mean they literally took individual segments and compared them to other individual segments. And they identified what kind of sensitivities occurred within or near those segments. So, for example, Route A has 25 sensitivities within 500 feet. Route B has five sensitivities within 500 feet. If that was the determination, they picked Route B and they got rid of Route A. So that's how they moved forward. That's what the point is. I mean, ComEd is the one sitting there getting rid of this and taking this and putting this in and getting rid of that based upon their criteria. Why don't you leave it to the Illinois Commerce Commission? Pick the best one or two alternate routes and let the Commerce Commission decide as opposed to ComEd deciding. You're selling us that you guys did your due diligence. Okay, you did your due diligence. The statute says propose an alternate route or two. How hard is that? If you already got these alternate routes that you figured out, why not throw them up on the board and see what sticks? That's an excellent question. I think what the legislature must have intended is that there would be some reasonable investigation done by the utility at the outset. It would have been easy for us to say, oh, there's an alternate route and draw a line on a map through a subdivision. It wouldn't be meaningful to anybody. It would waste everybody's time. So the way we looked at the statute is it required us to do what was a 10-month study before we filed the case. All of the information was in the original filing, and we thought the commission's got to have something to logically rely on. So we have an outside siting expert that does this for a living. They come in and they say, look, we've got this methodical procedure that we use that allows us to winnow down what is hundreds, if not thousands of opportunities in a huge area to get down to the final routes. And so in my view, it has to be principled. There has to be a reason behind it, and that's what this study lays out. And those opportunities were there. Elgin could have asked us questions about those opportunities. They're not good enough. Why did you get rid of these? They didn't send us one question. Counsel, what's your definition of good cause? My definition of good cause is that you start from scratch. You get all the available information that is available to you publicly or privately, and you analyze that data in a methodical, objective way where you can rule things out. We ultimately ended up with four alternate routes. It would have been very easy for us to say, here's an alternate route, but the study was applied consistently across the whole 700 square miles. And so I think the study itself, the integrity and the scope of the study itself, that's what established good cause. Were any alternate routes involved underground? Pardon me? Did any of the alternate routes involve underground routes? No, it didn't. And I think the evidence is very strong that underground, when there's overhead space available, that's the least cost standard. That's what we owe to our customers. We could easily put everything underground. Who would pay the cost of it? All customers would pay the cost. And I think the statute doesn't contemplate identifying an alternate route underground. Because think about how could you eliminate underground routes? It's almost a virtual impossibility. Do you want to wrap up? Sure. You know, I think importantly, what Elgin never did in this case, they never challenged the data. They never said you didn't get enough data. They never said the methodology, which has been used in other states, was insufficient in any way. They never cross-examined the siting expert. They never cross-examined staff's siting expert who independently concluded we established good cause. They didn't offer their own siting witness. I respectfully submit it was the scope and integrity of this study that established good cause. This is a textbook case of good cause. Thank you. Thank you, sir. Thank you. Mr. Harvey. May it please the court and counsel, my name is Matthew L. Harvey. I'm a special assistant attorney general here representing the Illinois Commerce Commission today. As Mr. Burnett indicated, I will address the second and third issues presented on appeal. More specifically, I will explain that the commission did not err in determining that the proposed route is least cost and equitable and that the commission staff adequately investigated the proposed route through Elgin to the extent that that is required by law. Now, as you pointed out, the commission's decision must be affirmed if it's supported by substantial evidence. And I would submit to you that the record evidence here in support of the commission's findings, it's overwhelming, as Mr. Burnett said. And it's almost entirely unrebutted. The great weight of evidence shows that there simply isn't a viable alternative route for the eastern segment of the project. And the city of Elgin's failure to identify one through Elgin is perhaps as strong of evidence of this as you can imagine. At this point, I do want to say that Elgin was free at any time during this proceeding to offer an alternative route that it believed was more appropriate than the one proposed by Commonwealth Edison. It didn't do that. Its only proposal was to put the route underground at a cost of conservatively $268 million more than the project would otherwise cost. And as Mr. Burnett points out, those costs would be borne by all common rate payers, not just the citizens of Elgin, but would be the only beneficiaries of this quarter of a billion dollar investment. What's the interplay between least cost means and good cause? Well, to take a step back from that, Your Honor, I tried to research good cause in this context when I was preparing this brief. And I am not sure there is a bright line. I think this is, as Mr. Burnett indicated, it's a case of first impression. And it's a matter that should, I think, be committed to the Commerce Commission's expertise. This is a statute that the Commerce Commission is bound to enforce and is charged with enforcing. And to the extent that there is a need to attach a construction to it or to, in this case, I think more accurately, identify good cause when it's sought, there should be some deference there. Here, I think, you know, a reasonable showing that there just isn't another choice. Counsel, are you suggesting that the standard on review should be manifestly erroneous because good cause is a mixed question of law and fact? That is one way to put it, Your Honor. Well, the other two are manifest way to the evidence or an abuse of discretion. So which one do you think fits the best? Well, as an agency lawyer, I always love the abuse of discretion, Your Honor. But I think that here, any way you slice it or dice it, there is overwhelming evidence that the Commission got this right, if it is indeed an evidentiary question. Did the State of Belgium submit any experts? If I recall correctly, what they submitted was the testimony of their mayor and two municipal resolutions. About 20 pages in total. And I'm sure Mr. Beck can fill that out. I believe that's his name. In any case, although I think we can agree that in the event that good cause has been shown, the Commission's 12-factor methodology isn't a terribly helpful analytical tool. But the Commission nonetheless did apply at least five or six of the factors in this case and found that they favored the route proposed by Congressman Edison for the eastern portion of the line. Moreover, the Commission did consider the other matters raised by the City of Belgium, including the undergrounding of the line, which would cost, again, between $250 million and half a billion dollars over what would otherwise be the case. And that, again, would be borne by ComEd's rate payers, including those not from Belgium. The Commission considered the arguments raised by Belgium and found that they lacked merit. Now, there's been some talk here about why the Commission supposedly should have deferred to its administrative law judges instead of rejecting their recommended findings and adopting its own. In fact, the Commission is obviously the ultimate finder of fact and concluder of law, if you will, in the administrative proceeding. And it is free to reject recommendations and conclusions brought by administrative law judges. And I can tell you from experience with the Commission that it routinely does so if it feels that it's warranted. Here, Section 10111 of our Act says that those conclusions are recommended or tentative and the Commission is ultimately the finder of fact. And this is consistent also with Section 10-45 of the Administrative Procedure Act. Counsel, I guess I don't quite understand why regularity in not accepting their position would cause an inference or an implication to arise that the Commission was right and the ALJs were wrong. Well, in this case... You implied that because they constantly overrule them that the ALJs were constantly wrong. And that is like talking about whether the glass is half empty or half full unless you've got some statistical analyses. Well, except that I probably was a little less precise in my speech than I... It would cause me to question more the... What is the legal significance of the ALJ's decision? If it is not binding on the Commission, then what difference does it make whether it's right or wrong? That's an excellent question, Your Honor. Well, is or are the decisions of the ALJs binding on the Commissioners? They are not, Your Honor. And to the extent I indicated... I knew that, but I just thought I'd get a concession from you. And I apologize for making it so difficult, Your Honor. You can wrap up, sir. All right. I do want to talk about the Curie case for a minute, Your Honor. And if the Commission... It's not applicable here. And to the extent that it is, the Commission staff conducted a full and more than adequate investigation of the costs, the benefits, and the routing of this project. And concluded that the Commonwealth Edison proposal was the best proposal. I thank you very much for your time. Thank you, sir. Mr. Beck, five minutes. Mr. Beck, did you ever... Did the City of Elgin ever submit its own citing expert in this case? The City did not submit a citing expert in this case, no, Your Honor. Did the City ever make any data requests regarding these proposed routes that were contained within the report? No. From the beginning, the City relied on ComEd and their obligation to fulfill their statutory obligation to identify alternate routes, and their failure to do so as the basis for the City's contesting in this action. And I want to talk about why those filing requirements are important. This is an extremely expedited schedule. This statute was adopted in 2010. And it provided for this expedited schedule where, at a maximum, they have... The Commission has 225 days from filing until the time that the Commission reaches a decision. During that time, there's direct testimony, rebuttal testimony, sub-rebuttal testimony, data requests, briefing, proposed order, evidentiary hearings before the Commission can order. And that's why these filing requirements and the obligation to file an alternate route is so important, and why the legislature requires a utility seeking approval to identify these alternate routes, because interveners, persons in the position of the City of Elgin, don't have the 20,000 hours to invest in a routing study, don't have the time in this expedited proceeding to go what had been corrected before under Section 406, which does not have this expedited timeline. ComEd relies, in their argument and in their brief, very heavily on their routing study and the comprehensiveness of their routing study, and that that's the basis for good cause. It simply can't be the case of good cause for failing to identify an alternate route. In this case, the same routing study for the Western 80% led ComEd to conclude that there was a preferred route and an alternate route, and they made arguments why their primary route was superior to the alternate route, but that didn't prevent them from submitting that alternate route to the Commission for their consideration. Well, you were free to offer an alternate route as well. The parties are free to offer alternate routes. That's correct. Do you know the difference between a V and a Y? They're basically two lines that either meet at the very end of the lines or somewhere they coexist and they come out and separate someplace else. And if you have two alternate routes that look like a V, then any point on either line is not on the other line except where they meet. However, if it's a Y, somewhere down the line to a point, the points on those two lines that are one on top of the other, so to speak, are identical. What is the formula, if there is one, as to where the alternate route should be either 90%, 80%, 70%, 50%, 40%? In other words, is it supposed to be a V or is it supposed to be a Y with a very, very small tip? Your Honor, I think that ComEd is under the allegation that hasn't been decided. We're looking at a Y that basically has one-fifth separated. That's correct. Okay. Now, if we're talking about alternate routes, is there some paradigm that says that you have to have 40% separate routes or is it 80%? How are we supposed to make this determination or is that something that the Commission decides? Well, I think that's something that the Commission has to decide. And ComEd simply offering that they have the superior route on this eastern 20% is not a good cause for providing some alternate route through this area. They talk about it. They've showed you the grid. There is hundreds and hundreds of opportunities. There are hundreds of opportunities, I believe they said. And at least one of those routes could have been submitted to the Commission for them to prove. There's routes that go up, down, left, right. But simply the fact that ComEd determined internally that the route is superior is not a good cause for not submitting an alternate route. Well, that was my question to Mr. Burnett. I mean, say you have an alternate route that goes through, goes actually directly through schools and through playgrounds and things, and you say, well, here's an alternate route, and clearly it's deficient to the proposed route, the main route, and isn't that just an act of futility? And isn't it the Commission's expertise to look at the study and look at whether there's an alternate route or not and see whether, again, it's based on substantial evidence that they don't need one? Well, the Commission does have expertise, and we cited the Cub case that we shouldn't defer to that, or courts should not defer to that expertise in a knee-jerk fashion when the area doesn't relate to their primary area of expertise. And I would submit good cause doesn't really relate to the primary area of expertise that, in this case, it simply is the Commission's. Wait a minute. When you say good cause, does it relate to the Commerce Commission's area of expertise? I think that we shouldn't defer to their interpretation of good cause and accept that just because ComEd did a comprehensive routing study for the entire project that we should accept their conclusions that all these unidentified routes that they eliminated were somehow inferior, that they've essentially usurped the role of the Commerce Commission in making that judgment, and that's something that should have been submitted to the Commission. Do you have a water heater in your house? Yes. Do you have a safety valve on it? I certainly hope so. Can you see the parallel between that safety valve on your water heater and the word or term good cause? As Justice Burke was pointing out, sometimes there are things where if you propose an alternate route, maybe even underground to the tune of $260 million to $300 million, that someone might say that that's not good cause. Those figures is not the amount for undergrounding in this, just through Elgin. That's for the entire project. If I could just use an analogy to illustrate what I think good cause means, if the court can imagine a statute where a regulated entity is authorized to buy a car with approval from a state agency, they have to also propose an alternative. The body that seeks to buy the car can talk about their routing study, or I'm sorry, whatever study they undertook to say we've determined that a car acts as our superior car, and here's all the factors we looked at. We spent hours and hours, and we eliminated all these other cars. But we're not going to tell you one single car that we looked at before the Commission decided, simply determining that something superior is not a good cause. They had an obligation to do that, so the residents of Elgin could have a full and fair hearing before their... And the Commission asked no questions. And the Commission asked no questions. I'm sorry? Did the Commission ask no questions, just like in your car study? So they just submit that, and this is the best car, and then everybody walks away. They've accepted that the study, whatever comment they did to eliminate the alternate routes, was sufficient in their mind. How much did the car cost? Well, that would have been determined if you compared it to the alternate, but... Gentlemen, thank you so much for your arguments here this morning. They're very enlightening, and we will take this case under advisement, render a decision in due course. Court is in a brief recess. Thank you, Your Honor.